pltf. ✓
Copy mailed to attorneys for parties by the Court pursuant to Rule 77 (d) Federal Rules of Civil Procedures. 5/3/05



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROSE A. BRAZIL,

    Plaintiff,

v.                                                           Case No. 04-C-610

HEISER LINCOLN MERCURY,

    Defendant.

## DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

### I. PROCEDURAL AND FACTUAL BACKGROUND

On June 23, 2004, the pro se plaintiff, Rose A. Brazil ("Brazil"), filed a complaint against defendant Heiser Lincoln Mercury ("Heiser") alleging that she had been discriminated against on the basis of her race.[1] Currently pending before the court is the defendant's motion for summary judgment, to which the plaintiff has not responded. For the reasons which follow, the defendant's motion for summary judgment will be granted.

Along with its motion for summary judgment Heiser filed a set of Proposed Findings of Fact (together with evidentiary support therefor). *See* Civil Local Rule 56.2. Brazil has not responded to the proposed findings. Consequently, the court concludes that there is no genuine issue as to any of such proposed findings of fact. *See* Civil Local Rule 56.2(e). The facts as set forth in the defendant's proposed findings are as follows.

---

[1] Although the plaintiff's complaint does not say so, the court assumes that Brazil is proceeding under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Heiser Lincoln Mercury, Inc. is a Milwaukee Lincoln-Mercury dealership engaged in selling and servicing a variety of motor vehicles. During all times relevant to this litigation, Chris Meyer was Heiser's General Manager, Lawrence Freschl was Heiser's Vice President of Operations, Cynthia Kasica was its Human Resources Manager, and Jalaine Maichle was its Office Manager. Maichle's predecessor Office Manager was Jennifer Meyers. (Defendant's Proposed Findings of Fact ¶ 1 ("DPFOF"))

Brazil began her employment as a cashier with Heiser on February 22, 1999. Her regularly scheduled hours were 8:30 a.m. to 5:30 p.m. As a Cashier, Brazil's duties included collecting money from customers, balancing the cash drawers at the end of the day, writing receipts for checks, typing up checks, checking out vehicle keys, and answering telephones, as well as other miscellaneous office work. (DPFOF ¶ 2)

At the outset of her employment, Human Resources Manager Cynthia Kasica reviewed with Brazil Heiser's various policies. Among them was its Attendance Policy, which stated:

> Employee must be present and punctual for all scheduled hours. If he is unable to be to work on time or at all, he must call his supervisor directly at or before start time. Excessive absenteeism will result in discipline that could lead to suspension and/or termination. Absences are unpaid.

(DPFOF ¶ 3)

On November 9, 1999, Brazil was hired as a part-time Cashier on the evening shift at Northpoint Ford, a Ford dealership located adjacent to Defendant Heiser Lincoln-Mercury and one which also comprises part of the Heiser Automotive Group. (DPFOF ¶ 4)

2

From early on in her employment, Brazil had a hard time getting to work on time. Consequently, Freschl personally purchased an alarm clock for her in the hopes that it would assist her in getting to work on or before her scheduled start time. (DPFOF ¶ 5)

On or about November 18, 1999, Brazil, along with all other cashiers, received a memo laying out "Cashout Procedures." This memo explicitly explained that cashiers were to do a complete cashout whenever they left their cash drawers and when they returned. Brazil received this memo both at Heiser, where she worked full time, and at Northpoint Ford, where she worked part-time. (DPFOF ¶ 6)

On December 8, 1999, Brazil received her first warning regarding her performance, after she had failed to properly close out some repair orders. Her manager, Jennifer Meyers, warned her about this. On the part of the Employee Warning Report on which an employee can make her own statement, Brazil acknowledged that she had made an error and had no excuse for it. (DPFOF ¶ 7)

On March 27, 2000, Brazil was issued another warning, as a result of a loud, verbal confrontation she had with another employee in the main office at the dealership. Both employees involved were advised that such conduct was not acceptable and would not be tolerated again. They were also warned about gossiping and making an unacceptable number of personal phone calls. (DPFOF ¶ 8)

Four days later, on March 31, 2000, Brazil was issued yet another warning after she left the office without her supervisor's permission and was found making personal telephone calls (Brazil had been counseled about personal telephone calls only four days prior). Brazil acknowledged that she was making a personal call and that she would not do it again. (DPFOF ¶ 9)

3

On April 5, 2000, Brazil was warned once again for violating Heiser's phone policy. After having received written warnings about her telephone usage on March 27 and March 31, 2000, she nonetheless made a personal call on company time on April 5, 2000. Once again, she was advised that personal phone calls were to be made during lunch hours only, and that any exceptions had to be authorized by a manager. (DPFOF ¶ 10)

On August 14, 2000, Brazil was issued another warning for failing to report to work on time on August 11, 2000. She had been scheduled to work at 8:00 a.m. and did not arrive at work until 8:38 a.m. (DPFOF ¶ 11)

When Brazil first started working at Heiser, Heiser initially was willing to offer some flexibility to her when she could not or did not appear for work on time and allowed her to make up the time. However, Heiser's patience with her tardiness began to dwindle beginning in September 2000. (DPFOF ¶ 12)

On September 29, 2000, Brazil received an Absentee Report for having arrived at work ten minutes late. (DPFOF ¶ 13)

On October 13, 2000, another Absentee Report was issued, due to Brazil's late arrival at work. (DPFOF ¶ 14)

On October 19, 2000, Brazil did not arrive at work until 8:40 a.m. She was again issued an Absentee Report. (DPFOF ¶ 15)

On October 30, 2000, Brazil was once again late for work, and another Absentee Report was issued. (DPFOF ¶ 16)

Brazil was tardy again without permission on both November 9 and 15, 2000. (DPFOF ¶ 17)

4

On November 20, 2000, due to the difficulties Brazil was having getting to work on time, her regular work hours were changed. Instead of her having to report to work at 8:30 a.m., her hours were changed to 9:00 a.m. to 6:00 p.m., so that she would have an extra half hour to get to work. Even with this change, however, Brazil was, on occasion, asked to come in earlier in order to ensure that the cashier position had proper coverage. (DPFOF ¶ 18)

On December 13, 2000, Brazil was issued another Employee Warning Report. On this occasion, she failed to go through the Telecheck process with two out of three checks that were received that day. In acknowledging her receipt of the warning, Brazil indicated that she simply did not remember having been told to do this. (DPFOF ¶ 19)

On December 20, 2000, Brazil received a Performance Review. She was rated "satisfactory" with respect to her work quality and work quantity, as well as her attitude. As to her dependability, however, she was noted to need improvement. Her supervisor, Jennifer Meyers, noted that she had had many court appointments that required her to miss work. Meyers noted that her hours had been changed because she was not showing up for work on time. Since her hours changed, her tardiness had improved, and she was no longer late for work, except when she had an appointment. (DPFOF ¶ 20)

On January 24, 2001, Brazil was issued another Absentee Report for her tardiness. (DPFOF ¶ 21)

On both February 2, 2001, and February 8, 2001, Brazil was issued Absentee Reports for tardiness without permission. (DPFOF ¶ 22)

On February 9 and 22, 2001, Brazil again was tardy for work without permission and was issued Absentee Reports. (DPFOF ¶ 23)

5

On February 23, March 2, 21, 29, and 30, April 4, 5, 27, May 17, 18, 24, 25, 31, June 1 and 8, 2001, Brazil arrived late for work without permission. (DPFOF ¶ 24)

On October 23, 2001, Brazil, together with Office Manager Jalaine Maichle and Vice President of Operations Larry Freschl met to discuss office procedures. Specifically, Maichle and Freschl advised Brazil that she needed to follow proper office procedures with respect to cashout, finishing work when asked, sitting at her desk and replacing service keys, and she needed to accept the instructions given her by Maichle without argument. They told her that if she did not follow proper office procedures, she would be written up and possibly terminated. They also told her that because she had not taken to heart the verbal counseling that she had been given to that point, in the future, any counseling given her would be reduced to writing. (DPFOF ¶ 25)

On October 31, 2001, Brazil was issued a formal Employee Warning Report, due to the fact that she had been warned previously about following office procedures. On this day, she had given out a vehicle key without logging out the proper information. (DPFOF ¶ 26)

On November 16, 2001, Brazil was issued yet another warning. On the prior day, her morning cash-out was short $30 in cash. She was counseled, once again, that accuracy was very important, and that she was responsible for her money. (DPFOF ¶ 27)

On December 27, 2001, Brazil received another Performance Review. On this occasion, her work quality was deemed satisfactory. Her work quantity was ranked between "unsatisfactory" and "needs improvement." Her job knowledge was rated between "needs improvement" and "satisfactory," and her attitude and dependability were both noted to "need improvement." (DPFOF ¶ 28)

On December 28, 2001, Brazil received another warning for the disrespectful attitude she exhibited toward her manager, Jalaine Maichle. Specifically, Maichle had asked Brazil if she had followed through on a deal she had been asked to check on the prior Wednesday. When confronted with these questions by Maichle, Brazil became defensive and loud. She was advised that due to the many warnings she had received about her negative attitude in the office and the need to follow through on assignments given to her, she was being suspended for one day. She was advised that continued outbursts and disrespect for managers would result in further suspensions and/or termination. (DPFOF ¶ 29)

On January 22, 2002, Brazil was issued another warning. On the prior day, she had failed to verbally notify the Office Manager or the General Manager that she would not be in. Company policy for calling in was reiterated. Brazil's response was that she had been on the schedule to be off for court and did not know "this type of punishment would occur." She thought the office staff was aware of her need to be off work, and she expressed that she felt the issuance of the warning was "totally extreme, but there is nothing I can say." Brazil was suspended for two days without pay and advised that further violations would include discipline up to and including termination. (DPFOF ¶ 30)

Brazil was issued a second warning on January 22, 2002, relating to the work she did at Northpoint Ford. On January 7, 2002, the afternoon cash-out was short $42 in cash, and Brazil was the night cashier on duty. She had not counted her drawer when she came on duty, which was a violation of company policy. Brazil was required to repay Northpoint Ford two-thirds of the shortage. (DPFOF ¶ 31)

AO 72A
(Rev.8/82)

On February 1, 2002, Brazil was issued another warning with respect to her conduct on January 31, 2002. On that day, Maichle asked Brazil to put away keys that had been accumulating from moving the cars on the lot to plow snow. Brazil told Maichle that she would not put the keys on the board – that she did not think it was fair – and that she didn't feel well. It was Maichle's position that if she did not feel well, she could have gone home. Maichle told Brazil that things needed to be done and, in response, Brazil consistently argued with her. General Manager Chris Meyer suspended Brazil without pay. He advised her that the next time she failed to complete a task given her, she might be suspended or terminated. (DPFOF ¶ 32)

On February 13, 2002, Brazil received an Absentee Report for her having taken an extended lunch without permission. (DPFOF ¶ 33)

On February 21, 2002, Brazil was issued a further Employee Warning Report, based on her tardiness that day. She was reminded that she had been written up for tardiness on August 14, 2001. She was advised that the next time she was late she might be suspended. (DPFOF ¶ 34)

On March 21, 2002, Brazil received yet another warning. On the prior day, she had been on duty for the night shift. In that position, she was required to complete several tasks before she left. On that night, she left before completing the tasks. She did not balance her cash drawer, file any of the day's papers and did not transfer the key inventory to the next day's log. She was advised that she was expected to complete all duties before leaving and that her cash drawer had to balance to $100, or a manager had to be notified of the errors. She was given a list of the night duties and warned that she was to complete all required duties before leaving. (DPFOF ¶ 35)

8

On March 27, 2002, despite having been warned on several prior occasions about counting her cash drawer when her shift started, Brazil failed to do so. Brazil wrote, "I am very aware of these procedures. I have no problem doing it." (DPFOF ¶ 36)

On March 29, 2002, Brazil was counseled about her having failed to follow cash-out procedures and also about having been asked by her manager, Maichle, to wait until her co-worker returned from the bathroom before leaving the dealership. In response to Maichle's request, Brazil badgered her until Maichle let her go. Upon her return to the dealership, Brazil continued to badger Maichle, complaining about her management and making other negative comments throughout the afternoon. Freschl suspended Brazil for three days. (DPFOF ¶ 37)

On May 15, 2002, Brazil was counseled yet again for having failed to close out a repair order during her afternoon cash-out the prior day. Brazil's response was to tell Maichle that she thought the repair order had been cashed out. Maichle told her to make sure that when she was doing cash-out, she check every repair order in the computer to see whether it was closed. (DPFOF ¶ 38)

On May 23, 2002, Brazil was counseled for being late that day. Maichle noted in her note to Brazil's personnel file that Brazil had been late almost every day by at least five minutes. (DPFOF ¶ 39)

A review of Brazil's time clock Punch Detail discloses that, in fact, Brazil had been late for work every day from May 8, 2002, forward. (DPFOF ¶ 40)

On May 28, 2002, Brazil was counseled about the time it was taking her to balance her cash drawer at cash-out before leaving the dealership for the evening. Maichle had changed the start time of the cash-out procedure to 4:45 p.m., to allow Brazil 15 minutes to balance her drawer. Prior to this, Brazil had been starting the cash-out procedures at 4:15 to 4:30, and had been away from her

9

regular duties for 45 minutes to complete the task. On May 28, 2002, the Payroll Department showed that Brazil had worked 1.4 hours of overtime because she hadn't gotten her cash-out done until 5:15 to 5:30 during that entire week. Maichle readjusted her cash-out start time to 4:30 p.m., so that Brazil could leave at her scheduled time of 5:00 p.m. (DPFOF ¶ 41)

On May 28, 2002, Brazil was counseled yet again after she had failed to close out a repair order. Maichle corrected the problem the following day. Brazil acknowledged that she had made a mistake. (DPFOF ¶ 42)

On June 21, 2002, Brazil was issued another warning, again for her failure to get to work on time. On this specific date, she did not arrive at her work station until 8:14 a.m. Since her start time for work was 8:00 a.m., and since she had been verbally warned and written up for being late in the past, she was advised via this warning that she was expected to be at her work station and ready for work at 8:00 a.m. every day. She was suspended for one day, and was advised that the next incident could result in termination. In response to this warning, Brazil said, "Basically this is true except I do not abuse Heiser in any way. I have been running several minutes late due to car problems and a constant thumb problem I'm having but I will try my best to abide by the rules." (DPFOF ¶ 43)

On July 29, 2002, Brazil was issued another warning for tardiness. Brazil responded, "I understand I have been a few minutes late frequently, due to car problems. But I will be working very hard on getting here on time, and my work is always done before I leave, regardless of my leaving late. I take this seriously and will comply." (DPFOF ¶ 44)

On August 16, 2002, Brazil was issued another warning when her cash drawer did not balance. She asked for help without having first recounted the drawer. When the drawer was

10

recounted, the missing money was found. Brazil was advised that she needed to be more careful with cash-out. (DPFOF ¶ 45)

Freschl terminated Brazil on August 29, 2002. On that day, Brazil called her supervisor, Maichle, at about 7:45 a.m. to advise her that she would be late due to a car tire problem. She said she needed to stop and put some air in it. Brazil punched in at 8:21 a.m. Freschl met with Brazil at about 11:30 that day to ask why Brazil had been delayed that long to put air in her tire. Brazil said that she had gone to the Clark Station at 76th & Bradley Road, instead of simply driving her car a few blocks further south to the dealership, where she could have gotten assistance from Heiser's Service Department. She said that when she had gotten to the air pump there, she had been unable to put any air in her tire because the valve stem was jammed. She said she had gotten dirty working on it, and she had finally asked one of the guys working there to help her. She said she had finally gotten the valve stem fixed and added air. (DPFOF ¶ 46)

Around 1:00 p.m., Freschl stopped at the Clark Station and asked the attendant if she had been working that morning, and if a guy had been working with her. The attendant told Freschl that she had worked all morning and that no one else had worked with her. She told him that she had not helped anyone put air in her tire. (DPFOF ¶ 47)

On the afternoon of August 29, 2002, Freschl, along with General Manager Chris Meyer, and Office Manager Cheri Francis, met with Brazil to advise her of her termination. Freschl reviewed with Brazil her protracted history of tardiness during her employment with Heiser. Freschl noted that Brazil had received numerous warnings for her tardiness, and that the last few warnings she had received had explicitly stated that no allowances would be made for any further tardiness. Freschl reminded her that she had acknowledged her tardiness and had promised to try to get to work on

11

time, but notwithstanding these warnings and Brazil's promises, she had continued to be late to work. (DPFOF ¶ 48)

Freschl next reviewed with Brazil the events of that particular day. Freschl told Brazil that he had stopped at the Clark Station after our meeting, and that the Clark Station employee there had told him that she had been the only one working there that day. Freschl told Brazil that this employee had told him that no one had stopped by that morning with a tire problem, and that she had not assisted anyone with putting air in a tire. Brazil indicated that the Clark Station employee was lying. (DPFOF ¶ 49)

Freschl told Brazil that because of her dismal record relating to getting to work on time even after she had been warned countless times, Heiser was terminating her employment. (DPFOF ¶ 50)

The time clock "Punch Detail" records for Shannon Biddle from January 21, 2002 (Biddle's date of hire) through August 29, 2002 (Brazil's termination date), reveal that Biddle was late approximately 32 times. However, a review of the "punch detail" records for Brazil shows that Brazil was late <u>over 100 times in the same period</u>. (DPFOF ¶ 51)

During Brazil's tenure with Heiser, there were no fewer than 19 individuals who were employed by Heiser as cashiers. Of those 19, six were black, one was Native American and 12 were white. Of these individuals, two of the black cashiers (in addition to Brazil) and three of the white cashiers were disciplined. The black cashiers were disciplined for excessive absences, failing to follow company policy regarding punching in, excessive personal phone calls, disputes with coworkers, gossiping, and failing to follow proper cashout procedures. The white cashiers were disciplined for not following proper cashout procedures, leaving the premises without permission and without punching out, tardiness, disrespect to a supervisor, poor attitude, use of cellular phones

12

at work, personal phone calls and not following proper procedures with keys. Many of these discipline issues related to the same policy violations for which Brazil was repeatedly warned. Importantly, however, none of these individuals had the atrocious attendance record that Brazil did. (DPFOF ¶ 52)

Since Brazil's departure, a number of different individuals have been hired as full time Cashiers at Heiser Lincoln Mercury, as follows:

| Name | Race | Hire Date | Term. Date | Reason |
|---|---|---|---|---|
| Natalee Keelan | White | 9/9/02 | 12/24/02 | Voluntary resignation |
| Qiana Carrington | Black | 1/30/03 | 2/11/03 | Quit due to step-father's illness |
| Tricell Gilbert | Black | 1/3/03 | 4/14/03 | Voluntary resignation |
| Karola Pitzka | White | 1/13/03 | 1/21/03 | **Terminated** |
| Linda Song | Asian Amer. | 3/12/03 | 8/12/03 | Voluntary resignation |
| Renee Clancy (rehired for part-time) | White | 3/24/03 1/26/04 | 9/10/03 9/2/04 | Voluntary resignation Voluntary resignation |
| Paula Wenger | White | 8/20/03 | 2/2/04 | Moved to Heiser corporate **(Currently employed)** |
| Jeryl Paulus | White | 10/6/03 | 1/9/04 | Voluntary resignation |
| Stephanie Johnson | Black | 2/25/04 | 11/30/04 | Moved to Heiser Ford **(Currently employed)** |
| Myrett Jackson | Black | 8/31/04 | none | **Currently employed** |
| Marina Hunt | Black | 2/8/05 | 2/22/05 | Voluntary resignation |

(DPFOF ¶ 53)

13

Jalaine Maichle does not have authority to issue a written warning to any employee or to fire any employee without Freschl's approval. (DPFOF ¶ 54)

At the time that Freschl made the decision to terminate Brazil's employment, he honestly believed that Brazil's shortcomings in her abilities were legitimate, sufficient and satisfactory reasons for her termination. Freschl still believes this today. Brazil's race played no part in his decision to terminate her. (DPFOF ¶ 55)

On February 20, 2003, Brazil filed a Discrimination Complaint against Heiser with the Equal Rights Division of the Wisconsin Department of Workforce Development ("ERD") and with the Equal Employment Opportunity Commission ("EEOC"). (DPFOF ¶ 56)

On March 25, 2004, after the EEOC completed its investigation, it issued Brazil a Dismissal and Notice of Rights, advising Brazil that it had been unable to conclude that a violation of the Federal Law had been established by the investigation. (DPFOF ¶ 57)

## II. DISCUSSION

### A. Standard on Motion for Summary Judgment

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an

14

otherwise "proper" motion for summary judgment. *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the non moving party. *Id.*

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). However, the court is "not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones." *Little v. Cox's Supermarkets*, 71 F.3d 637, 643 (7th Cir. 1995) (emphasis in original). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albeiro v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (quoting *Anderson*, 477 U.S. at 252).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F. 3d 833, 837 (7th Cir. 2001). To state it differently, "'[a] party will be

15

successful in opposing summary judgment only when they present definite, competent evidence to refute the motion.'" *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B. Proof of Discrimination

The plaintiff's complaint alleges that she was discriminated against based on her race. Specifically, the plaintiff seems to allege that she her employment was terminated because she is black. To prevail on a claim of race discrimination, the plaintiff must prove she was the victim of intentional discrimination. An employee may demonstrate his or her employer's intentional discrimination by providing either direct or indirect evidence. Direct evidence is evidence which, "if believed by the trier of fact will prove the particular fact in question without reliance upon inference or presumption." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). "Direct evidence essentially requires an admission by the decision maker that his actions were based upon the prohibited animus." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Here the plaintiff offers neither direct nor indirect evidence. Indeed, she has failed entirely to respond to the defendant's motion. Nevertheless, the court will discuss the facts in this case as if the plaintiff were proceeding under the indirect method of proof.

The indirect method of proof requires that the plaintiff apply the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under

16

AO 72A
(Rev.8/82)

Case 2:04-cv-00610-WEC   Filed 05/02/05   Page 16 of 20   Document 28

*McDonnell Douglas*, the initial burden is on the plaintiff to establish a prima facie case of discrimination. *Id.* at 801-03. To establish a prima facie case of discrimination Brazil must show that (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she experienced an adverse job action; and (4) similarly situated individuals were treated more favorably. If Brazil cannot establish a prima facie case, the analysis ends and her claim fails. *See Plair*, 105 F.3d at 347. On the other hand, if the plaintiff establishes all of the elements of a prima facie case, the plaintiff raises an inference of discrimination. *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir. 1994).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action that the employer took. *McDonnell Douglas*, 411 U.S. at 802. If the employer produces a legitimate, nondiscriminatory reason for its employment decision, the burden then shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason was pretextual. *Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir. 1994). A plaintiff may prove pretext directly by showing that a "discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for termination of the plaintiff's employment] is unworthy of credence." *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991).

Thus, the employee has the burden of showing that the employer's reason for the adverse job action was a lie or had no basis in fact. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998). It is not sufficient to prove that the reason was doubtful or mistaken. *Id.* It must be shown to be a phony reason for some action. Even if the defendant's reason for terminating the employee was mistaken, ill considered, or foolish, if the defendant honestly believed in the reason

17

AO 72A
(Rev.8/82)

Case 2:04-cv-00610-WEC   Filed 05/02/05   Page 17 of 20   Document 28

then pretext has not been proven. *Id.* It is not for this court to decide whether the reason for the employment action was "a correct business judgment, it is only to decide whether the decision makers honestly acted on that reason." *Bahl v. Royal Indemnity Co.*, 115 F.3d 1238, 1291 (7th Cir.1997).

Additionally, in her effort to prove pretext, the plaintiff must produce more than her subjective belief of her own qualifications and her disagreement with the employer's business decision. If that is all that is produced by the plaintiff, then there is no material dispute about the employer's honesty in its asserted reason for the decision. *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 481; *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("Plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reason for the employment actions."). It has been noted by the Seventh Circuit that employers may act for many reasons, but unless they act for forbidden reasons, "[n]o matter how medieval a firm's practice is, no matter how highhanded its decisional process, no matter how mistaken the firm's managers, Title VII . . . do[es] not interfere." *Sample v. Aldi, Inc.*, 61 F.3d 544, 551 (7th Cir. 1995).

Brazil has not established a prima facie case of discrimination. Indeed, she has not offered any evidence at all in response to the defendant's motion and in support of her claim. That having been said, Brazil is black and her employment was terminated. Thus, she is a member of a protected class and she did suffer an adverse employment action. But, she has offered no evidence that she was performing her job satisfactorily or that similarly situated individuals were treated more favorably than she. And the undisputed evidence shows that she clearly was not performing her job satisfactorily.

18

AO 72A
(Rev.8/82)

Indeed, the facts as set forth above demonstrate that she was not meeting Heiser's legitimate performance expectations with respect to her work quality and attendance. *See Oates v Discovery Zone*, 116 F.3d 1161 (7th Cir. 1997) (Evidence of employee's repeated absenteeism and failure to follow employer's attendance reporting procedures was "fatal" to employee's prima facie case of race discrimination in violation of Title VII and § 1981). Thus, the undisputed evidence demonstrates that Brazil cannot meet the second prong of a prima facie case.

Furthermore, Brazil has not produced any evidence to demonstrate that other similarly situated persons were treated differently than she was treated. Accordingly, she has also failed to satisfy the fourth prong of a prima facie case.

Finally, even if Brazil had produced sufficient evidence to make out a prima facie case, Heiser has produced a legitimate non-discriminatory reason for its termination of Brazil's employment – her unacceptable work performance. And Brazil has not produced any evidence to call into question the legitimacy of that reason. Stated another way, Brazil has not produced any evidence to demonstrate that Heiser's proffered reason for terminating Brazil's employment was a pretext for race discrimination.

In the end, when a plaintiff such as Brazil is faced with a motion for summary judgment she cannot just sit back and present nothing in response to such motion. Instead, it is incumbent on her to present sufficient evidence to demonstrate that there is a material issue of fact for a jury to decide. Brazil has failed to do so. Consequently, and for all of the foregoing reasons, Heiser's motion for summary judgment will be granted.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

AO 72A (Rev.8/82)

Case 2:04-cv-00610-WEC   Filed 05/02/05   Page 19 of 20   Document 28

**IT IS FURTHER ORDERED** that this action by and hereby is **DISMISSED**.

**SO ORDERED** this 2nd day of May 2005, at Milwaukee, Wisconsin.

*[signature]*
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

AO 72A
(Rev.8/82)